Good morning and may it please the court. My name is Harini Ragupathy with the Federal Defenders of San Diego on behalf of the appellant Mr. Mendez-Bello. On the fourth day of a five-day illegal re-entry trial when Mr. Mendez-Bello was already on the witness stand, the government indicated for the first time that it was going to use the 2013 statement of his attorney, the same attorney representing him at trial, as his own statement and as substantive evidence against him. The government's use of this unnoticed, undisclosed statement compromised Mr. Mendez-Bello's Sixth Amendment right to counsel. The district court in turn allowed the statement to come in concluding it didn't impair vigorous and legitimate advocacy on Mr. Mendez-Bello's behalf and didn't impact the ability of the defense to prepare the case and represent the defendant. Because the district court was wrong, this court should vacate Mr. Mendez-Bello's conviction. In United States v. Jung, the Seventh Circuit made clear that the unique nature of the attorney-client relationship demands that a trial court exercise caution in admitting statements that are the product of that relationship. The court cautioned the government that it should only offer this sort of evidence in rare cases and when absolutely necessary to avoid impairing the attorney-client relationship, chilling full disclosure by a defendant to his lawyer, and to turn defense counsel from vigorous... Counsel, even assuming that it was error to admit the attorney's statement, where's the prejudice? Your Honor, the prejudice here I think should be analyzed under a harmless beyond a reasonable doubt standard because it implicated his Sixth Amendment rights. Under that standard, here, there were four reasons why the error wasn't harmless. The first was that there was... this was far from an overwhelming case. Mr. Mendez-Bello took the stand and he offered plausible innocent explanations in his defense. Okay, so his principal defense was, I was coming to the... I didn't have the intent to enter the United States free from restraint because all I really wanted was to go to jail and get a meal. Correct. Okay, so first of all, and it's just a little bit of a facetious question, why are you here? He got his wish. Well, Your Honor, he... I'm here because he went to trial and he had a fundamentally unjust trial. And he's now changed his mind and he doesn't want to sit in jail in the United States, but he told everybody that was his defense. So the defense was, I wanted to go to jail and therefore he can't go to jail, but now that he is in jail, he doesn't want to be in jail. I have to say I'm a little confused about the motives here. Well, I think the defense, the reason I'm here is because under this, under the Fourth, Fifth, and Sixth Amendment, in the Fifth and Sixth, he's entitled to a fair trial. He didn't get that here. And so under this Court's case law, if this Court finds that that didn't entitle him to a fair trial, then he gets a new trial. So his principal claim was, I didn't intend to come to the United States in order to remain in the  So the defense suggested that on a previous entry into the United States that he was going to be headed to San Francisco where he had family. Correct. Okay. So, but most of the, but I don't see that that statement was really repeated very much in this, in this trial. It did not, it was not sort of the focal point of the government's case. I would dispute that characterization because the only disputed element, as Your Honor pointed out, was his intent. And the government's theory of the case was that his reason for going to the MCC was just a backup plan. And the only other reason the jury heard for why he was coming into the United States that would make going to the MCC a backup plan was that he had family in San Francisco that he was going to see. Well, he could have, he could have decided that he was coming into the United States to go and, to go and get work. There are a lot of other reasons that people come to the United States, even if they don't have close family ties. Correct. I apologize for interrupting. The only other reason the jury heard evidence of, though, the jury could have speculated as to a host of other reasons why he would have come in, but the only other reason the jury heard evidence of had to do with his family in the United States. If he was going to, if he was trying to enter the United States in order, in order to submit to the authorities so that he could get a free meal in jail, why did he choose to cross at a place, which is very, very isolated, in which he attempted to elude the Border Patrol officials? Well, if he chose to, the evidence showed one interpretation was that he chose to enter at a place that was heavily surveilled by Border Patrol agents. So there were Border Patrol agents on foot and vehicle and operating telescopes. And so he chose that part of one, one inference is that he chose that location because he knew that he would get readily caught. And consistent with that interpretation, he chose to enter on the night of a full moon where he would be more readily visible. He was apprehended just a short time after crossing the border, just a short distance from the border, all suggesting that he wasn't trying to hide or conceal himself. Not exactly like he jumped up and said, I'm over here, though. That's correct, Your Honor. He was probably lying, lying down under, under some brush, right? Well, that, that testimony was actually disputed. Mr. Mendez-Beo's testimony that was that he wasn't hiding, he was sitting in an open field, there was no vegetation around him. So that was a credibility determination that the jury was required to make. And this statement went directly toward undercutting his credibility. Help, help me with this. He testified. Correct. And he testified as to his intent. Correct. And the fact that he had family in San Francisco was also before the jury? The jury, the jury heard that he had family in San Francisco. What the, the significance of a 2013 statement was, it was an admission by his attorney that he came in to see his family. Absent that statement, the jury did not. I, I understand your argument. I just want to make sure that all the facts were also before the jury. And the argument was made to the jury as to his intent. Right. And, and the, the prosecution made its argument as well. Right. You mentioned, you said this is a Sixth Amendment issue. That's what you're focusing on now? Yes. Sixth Amendment. So it seems to me, if I understand this correctly, you have, you have two Sixth Amendment arguments. One is a Confrontation Clause argument, the other is a Conflict-Free Council argument. But it doesn't seem, it doesn't appear to me that the, that the, the confrontation issue was, was objected to at trial. Was it preserved? I believe it was preserved because defense counsel below informed the court of her Sixth Amendment concerns. She didn't specifically cite the Confrontation Clause. So to the extent that this court finds that that objection was insufficient to preserve the error, I of law. Because the only question left for this court to decide is whether an attorney's prior statement when used against the defendant is testimonial under the meaning of Crawford and the Sixth Amendment. And there are no disputed questions of fact. Well, that's my next question is why, how is it testimonial? How is it even Crawford? Well, I believe it's testimonial because the government used it as essentially a functional equivalent of testimony. It was an in-court statement. It was given by an attorney who was under an obligation and ethical duty to make statements that were true. The purpose of the statement was to establish or prove a prior fact, which was the circumstances that were related to Mr. Mendez-Beo's crime. And both the Second Circuit and the Fifth Circuit have held that statements that were made at a change of plea hearing are testimonial. And this was a change of plea hearing combined with a sentencing hearing. So I think transporting that case law here, it is testimonial. If I may briefly return to the harmlessness question, I think the strongest case that's analogous to this is United States versus Argueta Rosales. And that case also involved a situation where the defendant said he was coming in to go into protective custody. And the question is whether there was instructional error and whether that error was harmless beyond a reasonable doubt. And on a virtually identical set of circumstances where there was evidence for the prosecution, but there was also countervailing evidence for the defense, including the fact that the defendant entered not at a port of entry, that the defendant perhaps was concealing himself, there were several pro-guilt inferences. But this Court still held that the error there was not harmless beyond a reasonable doubt. And I believe that standard controls this case as well. If there are no further questions, I'd like to reserve the remainder of my time. You certainly may. Thank you very much. Thank you, Ms. Rajapathi. Mr. McDonald? Thank you, Your Honors. And may it please the Court, Colin McDonald for the United States. Mr. Mendez received a fair trial. The United States is now asking this Court to affirm his conviction and his sentence. And, Judge Bybee, you are correct that beyond, regardless of any evidentiary standard or the standard of review in terms of the harmlessness question, it is clear beyond any doubt that the evidence was so overwhelming that any error here would not be prejudicial to Mr. Mendez. His claim, his sole defense at trial, was that he entered the United States to enter custody. That was his sole purpose. His actions contradicted that in a very forceful way. His actions most definitely spoke louder than his words. He, as a defendant at trial, had an incentive to lie. The defense even states that in their reply brief at page 26, that the defendant had an incentive to lie, to make up the story on the stand. And his actions the day that he crossed the border show that he made great efforts to not enter custody. He started in Tijuana, directly on the border line at the Tijuana Canal. And there was testimony that if he wanted to go into custody, if he wanted to go into the MCC there in downtown San Diego, he could have simply walked right across the Tijuana Canal into the waiting arms of the Border Patrol. Would they have just turned him around and sent him back? There was no evidence of that. There was a Border Patrol agent who said that he had arrested 20 to 30 aliens in that spot. But in Argueta Rosales, you had somebody who was picked up just a couple of miles from the port of entry. It was between a double fence. And basically, the Border Patrol came up and said, you know, get back across the fence. There is evidence that this is a practice by the Border Patrol. That does happen. Absolutely, that happens. Mr. Mendez is a unique case because he's been in the criminal justice system for many years. He's a frequent illegal re-entrant. And so the Border Patrol, this is sort of extra record discussion, but from my perspective, he had great exposure to the criminal justice system. He had a number of 1326 convictions, a number of 1325 convictions. This is not someone that necessarily would have been turned away. And so instead of crossing the Tijuana Canal, he travels 71 miles east past three ports of entry, also places where he could have approached customs and gone into custody. He traveled all the way and including 26 miles on foot, 26 miles on foot to reach the part of the border fence where it drops from 17 feet down to 7 to 10 feet. He then was at the border. If he wanted to get into custody, he wasn't going to get over a 17-foot fence. That's true. I think that fact probably cuts both ways. But it is a location that is frequently crossed by illegal aliens. Judge Schroeder asked a good question about what was known about his family. So independent of the 2013 statement, was it known that Mr. Mendez had family in the United States? Yes, it was. That came out during the... The evidence was that the family was where? That the family, I believe that the family resided in San Francisco and that he had not seen them for some amount of time. He clarified during his redirect that he did have family in the United States, that he had not seen them for a long time. So that's part of the harmless... The family was an ex-wife or just an ex-girlfriend? His common-law wife is how he viewed her. And triplets? And triplets. And how old were the triplets? I don't think the ages were elicited at trial. I think the evidence was that they were born in the early 2000s, around 2000. So that's part of the harmless analysis too, is that the evidence that was elicited by virtue of the United States' cross-examination on the attorney's prior statement, the bulk of that evidence, if not all of it, was before the jury already independent of that cross-examination. And there's, for instance, the Lavoie case which says if challenged evidence is already before the jury through independent means, then that means that any error is harmless under those circumstances. The other reason that there's really no harm here is that there was no surprise to the defense here. The statement that Mr. Mendez was cross-examined on was given just 15 months, 15 months to the day before trial started. He stood before a different court and used his family there really as a sword to bolster his sentencing argument to the court. And he said, Your Honor, his attorney said to the court, Mr. Mendez, his motivation for reunite with his family and three children who live in San Francisco. That was just 15 months before. Then fast forward 15 months later to trial, and there he was standing before a federal jury telling them that he had no, suggesting that visiting his family was not a motivation for entering the country. As the district court, Chief Judge Moskowitz said, it would be unfair for the defendant to tell one thing to a sentencing judge 15 months before and then tell something entirely different to the jury 15 months later without them knowing about that previous statement. Now with regards to conflict, whether there was a conflict, Mendez has to show that there was an actual conflict of interest and that that conflict adversely affected his lawyer's performance. And he doesn't point to any evidence to show that his trial attorney, Ms. Kimple, was forced at any point between helping herself and helping Mendez. Number one, there's no showing that the statement, the 2013 statement, Ms. Kimple's representation to the court was somehow false or somehow could be impeached by putting her on the stand and asking her, you know, were you not quite accurate in your representations? There's no showing that there was any way to impeach that testimony. And this is important. Mendez was already on the stand. He was in better position than the attorney to tell the jury, to tell the court, whether the 2013 statement was somehow inaccurate, misleading, or false. And it simply would have been this, Mr. Mendez, your attorney's statement in 2013, was that inaccurate in any way? And he could have said, yes, it was. You know, I didn't really come to see my family. He could have done that. And Ms. Kimple, the attorney, her name was never revealed. So by asking that question, it wouldn't somehow put her between the jury box and the defendant and sort of put her in the crosshairs. She could have asked those questions of Mr. Mendez. He could have clarified it if there was reason to clarify that statement. But I think on this record, there simply was no reason to clarify it. And so there was no good faith basis for Ms. Kimple to try to impeach her own testimony. With respect to the Confrontation Clause, there was no objection on Confrontation Clause grounds. They say that they referenced the Sixth Amendment. They said the Sixth Amendment. Well, I went back and read the Sixth Amendment, and there's a lot of rights in the Sixth Amendment. In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be witnesses against him, to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense. There's a lot that's packed into the Sixth Amendment there. And for them to say that just by virtue of saying the magic word Sixth Amendment, that somehow put the court on notice that there was a Confrontation Clause issue, I think is not quite a fair representation of the record. And there is no precedent for the claim that this was a testimonial statement. Testimonial within the context of the recent cases post-Crawford shows very clearly that the primary purpose of that statement has to be to further a government investigation. And here the statement was designed to offer Mendez's sentencing position to the court. There's no precedent to find that it's testimonial. With respect to the sentencing, is it your understanding that in order to accept the appellant's argument, we would have to overrule Amendera's torus? Absolutely. Absolutely. And this Court repeatedly has said that it can't and won't. Absolutely. Unless the Court has any further questions, I will submit. Thank you, Mr. McDonald. Thank you. Mr. Agilpathy, you've got some time reserved. Thank you. Regarding the harm, Mr. McDonald mentioned that Mr. Mendez-Beyo was already on the stand and therefore he was in the best position to refute the prior 2013 statement. I think that misses the harm that was caused in this case by the lack of notice. Ms. Kimple didn't have the opportunity to consult with Mr. Mendez-Beyo about that statement. And so given her duty to present the best front for him, at that point, it would have been an extremely risky situation for her to simply ask him, was that prior statement true or false, without having the opportunity to have had a previous discussion with him on that matter? Could she have asked for a continuance? Could she have asked for an opportunity to talk to her client? She could have, Your Honor, but I think at that point, she had made her position so thoroughly clear that the evidence shouldn't have come in. Perhaps the best practice would have been to ask for a continuance, but I think once the district court shut her down and said this evidence is coming in, she took the safest position, which was to not ask her client about that, because she didn't know what he was going to say. But isn't there something to the judicial estoppel here, that he's telling one district judge one thing and then testifying in another court as to something different? Perhaps, Your Honor. And I'm not disputing that this statement maybe could have come in in different circumstances. I think what creates the prejudice in this case was that there was no prior notice of the circumstances in this case. Had Ms. Kimple known that she was a potential witness, she could have had that conversation with Mr. Mendez-Beyo before trial. They could have potentially waived any conflict of interest, or he could have said, you know what, I want you to appear for me on the stand and I'm going to get new counsel. He could have said, maybe I'm going to take a plea because this evidence is so damning, I'm not going to go to trial, or I'm going to go to trial and not take the stand or present a different defense. But all of those possibilities were precluded because of the way this evidence came about, surprise, mid-trial, without any kind of disclosure. If the Court has no further questions. Thank you very much. Thank you very much. We appreciate the argument of counsel. United States v. Mendez-Beyo is submitted.
judges: Schroeder, Bybee, Smith